**E-FILED**
Thursday, 30 November, 2006  04:10:43 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR05-20043 |
| | ) | |
| LANCE A. OLIVER, | ) | |
| | ) | |
| Defendant. | ) | |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The United States of America, by its attorneys, Rodger A. Heaton, United States

Attorney for the Central District of Illinois, and Colin S. Bruce, Assistant United States

Attorney, hereby tenders these Proposed Findings of Fact and Conclusions of Law

following the bench trial in this cause.

**Introduction and Elements of the Offenses[1]**

Lance Oliver, the defendant in this cause, is charged in a three-count indictment

with (count one) possession of 50 or more grams of cocaine base ("crack") with the

intent to distribute, in violation of 21 U.S.C. §841(a) and (b)(1)(A),(count two)

possession of a firearm by a felon, in violation of 18 U.S.C. §922(g), and (count three)

possession of a firearm in furtherance of a drug trafficking crime, in violation of 18

U.S.C. §924(c).(R.9)

---

[1]References to the documents in the record are to the docket number on the district
court's docket sheet, e.g., "R.__"; references to the Transcript of the Bench Trial are to "Tr.
___."

-1-

After considering the applicable elements of each of the charges, and the stipulations of the parties, the Court should find that the defendant is guilty beyond a reasonable doubt of all three charged offenses.

Specifically, Count One of the Indictment, possession of 50 or more grams of cocaine base ("crack") with the intent to distribute, in violation of 21 U.S.C. §841(a) and (b)(1)(A), has the following elements, each of which the United States must prove beyond a reasonable doubt:

-First, that the defendant knowingly possessed 50 or more grams of cocaine base ("crack");

-Second, that the defendant possessed the cocaine base ("crack") with the intent to distribute it; and,

-Third, that the defendant knew the substance was a controlled substance.

Count Two of the Indictment, possession of a firearm by a felon, in violation of 18 U.S.C. §922(g), has the following elements, each of which the United States must prove beyond a reasonable doubt:

-First, that the defendant was previously convicted of a felony offense;

-Second, that the defendant knowingly possessed the firearm charged in the Indictment; and,

-Third, that the charged firearm had previously traveled in interstate or foreign commerce.

-2-

Count Three of the Indictment, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §924(c), has the following elements, each of which the United States must prove beyond a reasonable doubt:

> -First, that the defendant committed the crime of possession of 50 or more grams of cocaine base ("crack") with the intent to distribute as charged in Count One;
>
> -Second, that the defendant knowingly used or carried a firearm during and in relation to that crime.

**Stipulated Facts**

In the Waiver of Jury Trial and Stipulations for Bench Trial, the parties stipulated and agreed to the following facts underlying the charges against the defendant:

> On August 7, 2005, a state search warrant was executed on the defendant Lance Oliver's residence, 204 Crestlane Road, Apartment #305, Kankakee, Illinois. When the execution of the search warrant commenced, the agents knocked and announced their presence and purpose. After waiting a reasonable amount of time, the agents forcefully entered the apartment and found no one inside.
>
> Shortly after entering the defendant's apartment, the agents found a plastic bag containing cocaine base on a stereo speaker in the bedroom. Another plastic bag of cocaine base was found inside a white Nike tennis shoe, located on the top shelf of the bedroom closet.  (A subsequent

forensic analysis of a portion of the seized cocaine base confirmed the substance was cocaine base with a weight of 52. 9 grams).

The agents also found two handguns between the mattress and box spring of the bed in the bedroom. One gun was a Taurus 9mm semi-automatic handgun which contained a magazine with ten  round of ammunition and an empty chamber -  the serial number was ground down to bare metal with no numbers visible; the other gun was a Tanfoglio, .40 caliber semi-automatic handgun (serial number AE14233) that contained a magazine with six rounds of ammunition with a live chamber.

The agents also located documents showing proof of residency in the name of Lance Oliver in the bedroom: a State of Illinois driver's license, a cleaner's receipt, a claim check from an unknown jewelry store, and mail from an inmate at Dwight Prison. These documents were located on the same speaker as one of the plastic bags containing cocaine base.

The agents also located two electronic scales and three bags of Apple brand jewelry bags on the kitchen counter.  An expert in drug trafficking concluded these materials are consistent with drug trafficking and distribution.

An analysis of the seized firearms concluded that neither of the

seized firearms were manufactured within the State of Illinois.  Therefore,

both firearms traveled in interstate commerce.

An expert in drug trafficking concluded that, based upon the facts

and circumstances of the search and the items seized during the search,

the firearms were possessed in furtherance of the distribution of the

cocaine base and recognized as "tools of the trade."

Finally, prior to August 7, 2005, the defendant was convicted of

three felony offenses.

(R.34,¶4)

The defendant did *not* stipulate that the cocaine base possessed by the defendant

was in the form of "crack."

**Proposed Findings of Fact and Conclusions of Law Concerning The Elements of the**
**<u>Charged Offenses</u>**

Based upon the elements of the offenses and the stipulations of the parties, the

Court should make the following Findings of Fact and Conclusions of Law:

Count One:

-First, that the defendant knowingly possessed over 50  grams of cocaine
base;

-Second, that the defendant possessed the coaine base  with the intent to
distribute it; and,

-Third, that the defendant knew the substance was a controlled substance

-5-

Count Two:

    -First , that the defendant was previously convicted of a felony offense;

    -Second, that the defendant knowingly possessed the two firearms charged in the Indictment; and,

    -Third, that the charged firearms had previously traveled in interstate or foreign commerce.

Count Three:

    -First, that the defendant committed the offense of possession of 50 or more grams of cocaine base with the intent to distribute charged in Count One of the indictment; and,

    -Second, that in furtherance of this drug trafficking offense, the defendant possessed the firearms charged in the Indictment.

The defendant, therefore, is guilty beyond a reasonable doubt of all three charged offenses and the Court should so enter judgement.

**The Nature of The Cocaine Base**

Although the stipulated facts establish that the defendant is guilty beyond a reasonable doubt of all three charged offenses, the parties placed the issue as to whether the cocaine base possessed by the defendant was in the form of crack or in some other form before the Court.

The United States believes the evidence has proven, beyond a reasonable doubt, that the cocaine base possessed by the defendant was crack, and not some other form of cocaine base. In reaching this conclusion, the United States believes the Court should first look to the applicable definition of crack and Seventh Circuit caselaw.

Next, the Court should consider the testimony of the witnesses called by the United States, each of whom meets the criteria of an "expert" under the applicable Seventh Circuit criteria. Each of these "expert" witnesses stated that the cocaine base possessed by the defendant was crack.

Finally, the Court should consider the background and testimony of the defendant's sole witness, Dr. Michael Evans. An examination of Dr. Evans' qualifications can only lead to the conclusion that he is not an "expert" on crack identification under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), nor was his testimony relevant to the issue since it was based upon his own definition of crack.

Thus, when the Court considers the evidence and the relevant definition of crack, the Court should find, beyond a reasonable doubt, that the cocaine base possessed by the defendant was crack.

**Definition of *Crack***

Under the applicable Seventh Circuit caselaw, "crack" is a street term, not a scientific term. *United States v. Edwards*, 397 F.3d 570, 574 (7th Cir. 2005).

For statutory purposes under 21 U.S.C §841, the definition of "crack" is the same as that found within the Sentencing Guidelines. *See United States v. Edwards*, 397 F.3d 570, 572-575 (7th Cir. 2005) (citing *United States v. Booker*, 70 F.3d 488, 494 (7th Cir. 1995)); *United States v. Hall*, 109 F.3d 1227, 1236 (7th Cir. 1997).

The Sentencing Guidelines define crack as "the street name for a form of cocaine base, *usually* prepared by processing cocaine hydrochloride and sodium bicarbonate, and *usually* appearing in a lumpy, rocklike form." (emphasis added) *U.S. Sentencing Guidelines Manual* § 2D1.1 n. D (2005)

Indeed, the Seventh Circuit has expressly found that crack is not exclusively manufactured using sodium bicarbonate. "We hold that while crack might generally be produced using sodium bicarbonate, production with sodium bicarbonate is not the exclusive preparation method recognized for purposes of § 2D1.1(c)." *United States v. Abdul*, 122 F3.d 477, 479 (7th Cir. 1997)

The Court in *Abdul* further explained that attempting to narrowly define crack as cocaine base only manufactured with sodium bicarbonate would thwart the intent of the Sentencing Commission and Congress. "If courts were to disregard the qualifying term 'usually,' crack dealers could avoid the penalties for distribution of crack by merely finding some substitute for baking soda in production, or by crushing the rocks so that the final product resembles powder." *Abdul*, 122 F.3d at 479.

Instead, rather than trying to define crack by a single means subject to forensic analysis, the Seventh Circuit has defined the issue as whether an individual familiar with crack can recognize the cocaine base as crack. "[W]e hold that requiring proof that the cocaine has been processed with sodium bicarbonate would impose too rigid a standard to comport with congressional intent. The question does not turn on what particular method is used to fashion crack or on its visual appearance, although it is

'*usually*' made from sodium bicarbonate and '*usually*' appears in lumpy, rocklike form. The issue is whether the drug is 'crack' as the term is generally understood." *Id*.

**"Experts" on Crack**

The Seventh Circuit has noted that the individuals in the best position to recognize crack are crack dealers and experienced drug agents, those who deal with crack on the street, not a forensic chemist. *United States v. Anderson*, 450 F.3d 294, 301 (7th Cir. 2006)(the *real* experts on crack are those familiar with crack, including those who sell or use it); *United States v. Bradley*, 165 F.3d 594, 596 (7th Cir. 1999). Thus, the testimony of an experienced drug agent and an admitted "crack" manufacturer and seller are the most relevant to this inquiry. By contrast, the testimony of forensic or scientific experts is of little, if any, relevancy.[2]

The Seventh Circuit has explained that once a substance is identified as containing cocaine base, the "experts" on whether the cocaine base is crack are crack dealers, crack users and experienced drug agents familiar with crack on the street. *United States v. Anderson*, 450 F.3d 294, 301 (7th Cir. 2006)("We have repeatedly held that the government can prove a substance is crack by offering testimony from people familiar with the drug, including those who sell or use crack, since they are the real experts.")(citations omitted)

---

[2] The parties stipulated that the substance in question weighs over 50 grams and contains cocaine base.

For example, in *United States v. Linton*, 235 F.3d 328 (7th Cir. 2000), the district court found that the substance the defendant possessed was crack, and not some other form of cocaine base.[3] This finding was based upon the testimony of a forensic chemist, who identified the "chunky" substance as containing cocaine base, and an experienced drug agent, who testified that based upon the packaging and the appearance of the substance, it was crack. *Linton*, 235 F.3d at 329.

The district court's finding was upheld on appeal. In so doing, the Court of Appeals noted that "the testimony of witnesses familiar with crack, combined with direct evidence that the substance had the appearance of and was packaged like crack, is sufficient to satisfy burden of proof and permit a district court to conclude that a defendant possessed crack."*Linton*, 235 F.3d at 330.

Likewise, in *United States v. Bradley*, 165 F.3d 594 (7th Cir. 1999), the defendant claimed the substance he distributed was not proven to be crack. In affirming the district court's finding that the substance *was* crack, the Court emphasized that individuals who use or sell crack "are the real experts on what is crack." Furthermore, the testimonies of an experienced DEA drug agent and a crack dealer that the substance

---

[3] Because this was a Sentencing Guidelines issue, the burden of proof was by a preponderance of the evidence, and not beyond a reasonable doubt. Nevertheless, the reasoning behind the decision concerning the admission of the evidence and the identification of crack "experts"in *Linton* and the other cases cited, remains sound. *See Anderson*, *supra*.

was crack, in combination with a forensic analysis which proved the substance

contained cocaine base, was found to be sufficient to prove the substance was "crack."

*Bradley*, 165 F.3d at 596.

Similarly, in *United States v. Griffin*, 194 F.3d 808 (7th Cir. 1999), the Court found

that once a forensic chemist testified that substance in question contained cocaine base,

an experienced drug agent and a crack dealer could appropriately identify the

substance as crack. *Griffin*, 194 F.3d at 829.[4]

Thus, in the Seventh Circuit, the "experts" on crack are crack dealers, crack users

and experienced drug agents familiar with crack on the street, not forensic chemists.

## The Evidence Offered By The United States

Based upon the Seventh Circuit's definition of crack and the caselaw concerning

the qualifications of a "crack" expert, the Court should find that all three witnesses

called by the United States offered credible testimony, that they all qualify as "crack"

experts, and that based upon their testimony, the cocaine base possessed by the

defendant was crack.

---

[4] *See also*, *United States v. Earnest*, 185 F.3d 808 (7th Cir. 1999) (testimony at trial by law enforcement agents, confidential informant, and other co-defendants that substance at issue was crack and that they dealt crack, as well as testimony from chemist that the substance was cocaine base in an "off-white, chunky" form, along with failure of defendant to object to characterization of drugs as crack, sufficient to show that substance at issue was crack).

*Detective Ed Root*

The United States called Detective Ed Root as its first witness in the bench trial. The following is a summary of Detective Root's testimony.

He is a veteran Decatur police officer with over 25 years experience, over 17 years of which involved narcotics enforcement. He has received extensive training in narcotics investigations, and has received a number of awards for his work on narcotics related cases. (Tr.3-6)

Detective Root has been involved in well over 500 search warrants involving controlled substances, between 400 and 500 of which involved cocaine or crack. He has also interviewed over 1000 individuals who possessed or used cocaine or crack, and over 500 individuals who distributed cocaine or crack. He also participated in over 500 purchases of cocaine or crack. He has personally held crack over 1000 times. (Tr.6-7,8)

Based upon his training and experience, the Court properly found Detective Root to be an expert on drug identification, cocaine and crack trafficking and crack identification. (Tr.9,14)

Detective Root explained that crack is made by mixing powder cocaine with water and baking soda, heating the mixture, straining of the water and then allowing the remaining substance, the crack, to dry either at room temperature or in a freezer. (Tr.19,26-27)

In addition to using water and baking soda, crack can also be made by substituting Sprite or 7-Up for the water. This causes the crack "rocks" to look larger than they actually weigh. Likewise, "Snap Back" or "Come Back," which is a actually swimming pool cleaner, can be used instead of baking soda. This will increase the amount of crack produced. (Tr.20-21,26-27,31)

Different types of soft drinks can also be used to color the crack for marketing purposes, including orange soda, grape soda and root beer. (Tr.21-22)

Crack can come in a variety of colors, including white, tan, yellow, light yellow, grey, and peanut butter. (Tr.23)

Both powder cocaine and crack cocaine have unique smells. Detective Root has smelled crack cocaine hundreds and hundreds of times. (Tr.24)

Detective Root examined government's exhibits 1A, 1B and 1C, which by stipulation contained 52.9 grams of a substance containing cocaine base. Based upon his training and experience, his visual observation of the cocaine base, and his smelling the cocaine base, Detective Root concluded exhibits 1A, 1B and 1C were crack cocaine. (Tr.23- 25)

Further, the size of the plastic bags, government's exhibit 6, which were seized with the cocaine base, were not consistent in their size with the sale of powder cocaine. (Tr.34)

*Troy Fuller*

The United States called Troy Fuller as its second witness in the bench trial. The following is a summary of Troy Fuller's testimony.

Fuller is a 35 year old federal prisoner. In March of 2000, he entered into a cooperation agreement with the United States, government exhibit 12, which required him to cooperate with law enforcement agents and to testify truthfully, among other requirements. (Tr.38) His testimony in this case was under this cooperation agreement. (Tr.41)

In September, 2003, Fuller pled guilty to possession of over 500 grams of cocaine with the intent to distribute, as well as money laundering offenses, pursuant to a written plea agreement, government exhibit 13, before this Court. (Tr.39)

In a subsequent trial in 2005, Fuller testified and admitted to being capable of making crack "better than Martha Stewart." (Tr.40) Fuller, however, has never used crack himself; he prefers marijuana and Ecstacy. Nevertheless, Fuller made crack virtually everyday for eight years, from approximately 1994 through 2002. (Tr.42) Fuller admitted that he made crack a few times after he pled guilty. (Tr.44) He made crack for other people several times a week for years. (Tr.52)

Fuller has made crack in amounts ranging from one-half gram of powder up to 27 ounces of powder, (Tr.43-44,46) and has handled crack more than 1000 times. (Tr.59)

Fuller usually made crack in a kitchen. (Tr.67) To make crack, Fuller took powder cocaine, broke any chunks or lumps into a finer powder, placed it in a Pyrex bowl that

-14-

was washed in hot water, added some baking soda, stirred the mixture, then added water. He then heated the mixture in a microwave oven.  If he wanted to increase the volume of the crack, he added more baking soda and vigorously stirred the baking soda in once the crack was in a gel-like state. (Fuller referred to this as the "whip appeal"). (Tr.44-46,67,71,79-80,85-86)

After mixing and heating the crack mixture, Fuller made sure there were no lumps in it, then he added cold water which caused the crack to "rock up." (Tr.46,50) It was important that some water was left in the mixture so the crack did not "burn up." (Tr.49-50) Fuller would increase or decrease the amount of baking soda added to the mixture based upon the amount of crack being produced. (Tr.51) Once the crack was done being heated, any excess water and impurities (including excess baking soda) were dumped out. (Tr.86-87)

On occasion, Fuller made crack with "Come Back" instead of baking soda. Fuller also made crack mixing Vitamin B-12 in with the baking soda, or by adding Sprite instead of water, to increase the volume of crack produced. (Tr.48-49,72)

Once the crack was in a gel-like state, Fuller let it dry on a paper towel to allow any additional water to evaporate, then he cut and weighed it out for sale. (Tr.50-51,73-74)

Crack can be a variety of colors including white, off-white, yellow, beige, pink and silver or steel gray. (Tr.55) Crack also has a distinctive smell, different from powder cocaine,  which Fuller could recognize. (Tr.58-59) Also, crack and powder cocaine feel differently, even if the crack is pounded into a powder, much like sand versus powder. (Tr.60)

Without objection, the Court found Fuller to be an expert on crack manufacturing, distribution and identification. (Tr.60-61)

Fuller examined the electronic scales, government exhibit 5B, which had a white residue. Ths residue smelled like crack to Fuller. (Tr.63-64) Fuller also examined government exhibits 1A, 1B and 1C and stated that the plastic bags contained crack. Fuller was even able to tell that the crack in government exhibit 1B contained better quality crack than 1A or 1C, based upon the texture and the way they appeared. (Tr.65-66,77) Fuller also smelled the exhibits and stated that they smelled like crack. (Tr.66,76)

*John Casale*

The United States called DEA Chemist John Casale as its last witness in the bench trial. The following is a summary of John Casale's testimony.

Casale works at the Drug Enforcement Administration (DEA)Special Testing and Research Laboratory in Dulles, Virginia. He has a bachelors degree in chemistry and currently holds the position of Senior Research Chemist. (Tr.89)

The Special Testing and Research Laboratory is internationally recognized as the world's leading drug analysis laboratory. Within the lab itself, Casale is recognized as the expert on cocaine. (Tr.90) He has analyzed and researched cocaine for over twenty years and is the lead chemist in DEA's cocaine signature program, a program which identifies the geographic origin of specific cocaine. (Tr-90-91)

Casale has debriefed over 300 cocaine manufacturers.  Furthermore, while undercover, Casale has observed cocaine being manufactured outside a laboratory setting, including in  South American jungles.. (Tr.91-92) Ten days prior to testifying in this case, Casale was in the jungles of Peru, assisting the Peruvian National Police seize a cocaine processing laboratory. This was not the first time Casale was involved in this type of activity. (Tr.92)

Casale has authored numerous published papers in scholarly journals on cocaine, crack, and the manufacture of crack. Furthermore, he has trained more than 1000 chemists on the manufacturing of crack.(Tr.92-93) He has personally manufactured crack over 100 times; he learned how to make crack by debriefing drug traffickers and watching crack be produced. (Tr.94,98) He has made crack in amounts as small as less than one gram and as large as three kilograms. (Tr.98)

Casale has been qualified on numerous occasions as an expert on cocaine and crack manufacturing. This Court found that he was an expert in cocaine and crack manufacturing without objection. (Tr.93-94)

-17-

Casale explained that there are two forms of cocaine: cocaine base and cocaine hydrochloride. Drug traffickers prefer to use cocaine base as the form to initially ship their cocaine because it has a longer "shelf life." For this reason, coca paste became obsolete in the mid-1990's. (Tr.95-96)

Further, Casale agreed with the proposition that all crack is cocaine base, but disagreed with the proposition that not all cocaine base was crack. His reasons for disagreeing with the second phrase is that unless the cocaine base was mixed with something rendering the cocaine base unsmokeable, the substance was crack. For example, if a South American drug trafficker mixed the cocaine base with a plasticizer, then poured the mixture into a mold to form a figurine or a picture frame for smuggling purposes, that cocaine base would not be crack because it was not smokeable. (Tr.96-97)

Casale has made crack using baking soda, baking powder and household ammonia. (Tr.98-99) Moreover, he has observed crack manufacturers making crack using all of these substances.(Tr.99)

The procedure Casale uses to manufacture crack was nearly identical to the procedure Troy Fuller described. Casale mixes cocaine hydrochloride (powder cocaine) and water, stirs the mixture, then adds baking soda. (Tr.99-100) Once thoroughly mixed, he heats the mixture which causes the cocaine base oil to sink down to the bottom. (Tr.101-102) All of the water is not boiled off to prevent the cocaine base from degrading. (Tr.105) The cocaine base is then cooled at either room temperature, or by

-18-

putting it in a refrigerator or freezer where it solidifies. (Tr.102) Once the cocaine base solidifies, the excess water, baking soda and impurities are poured off and  the cocaine base - now crack -  is allowed to dry. (Tr.102-03)

Regardless of whether crack is made with baking soda, baking powder, or ammonia, there will *not* always be a detectable amount of the substance within the crack. In fact, in the thousands of crack exhibits Casale has analyzed, it was not uncommon for there to be no detectable amounts of bicarbonate or ammonia in the crack. (Tr.106) These exhibits were "street" crack, not crack made in a laboratory. Furthermore, Casale watched some of this crack being made, obtained it, and later analyzed it in his laboratory. In some of these samples, no detectable amounts of bicarbonate were found. (Tr.107-08) In essence, based upon his extensive experience, it is possible to make crack on the street with no detectable amount of base being present. (Tr.108-09,120-23)

Casale further agreed with Detective Root and Troy Fuller that crack has a distinctive smell which Casale is also able to recognize. (Tr.104) The smell is from the degradation of the cocaine base molecule and comes from a chemical called methyl benzoate. This is different from the smell of cocaine hydrochloride (powder cocaine). (Tr.104-05)

When Casale examined government exhibits 1A, 1B and 1C, he identified them as crack, based upon their appearance, their odor and the stipulation that the exhibits contained cocaine base. (Tr.109)

-19-

<u>The Evidence Offered By The Defendant</u>

In contrast to the three crack experts offered by the United States, the defendant offered only the testimony of Dr. Michael Evans, a toxicologist with limited experience in crack. Under applicable Seventh Circuit caselaw, Dr. Evans did not qualify as an expert on "crack," nor was his testimony relevant to the issue of whether the cocaine base possessed by the defendant was crack.

*Michael Evans*

The following is a summary of Dr. Evans testimony.

Dr. Evans is a toxicologist who holds a Ph.D. in toxicology. Approximately 30 years ago, Dr. Evans performed research on the toxicological effects of cocaine. (Tr.135-36) He has also served as a consultant to the U.S. Department of Transportation on drugs and driving. (Tr.137) He developed a toxicology program for the State of Indiana on alcohol, drugs and traffic safety.(Tr.138)

At the time he testified, Dr. Evans was the president and CEO of AIT Laboratories, a corporation focused on toxicology. (Tr.140) Many years ago, he researched the effects of cocaine on the human body, and more than 20 years ago lectured at a symposium on cocaine on behalf of the U.S. Department of State. This symposium had nothing to do with the analysis of a street sample of cocaine base. (Tr.142,155 )

-20-

Although Dr. Evans has testified as an expert 200 to 300 times, he has testified for the prosecution as an expert involving the analysis of a street sample of crack cocaine only five or six times. (Tr.148-49) Further, Dr. Evans has never been called by the prosecution in a federal case involving the analysis of a street sample of crack cocaine. (Tr.150)

Dr. Evans could not recall ever testifying that a street sample of cocaine base was crack. (Tr.151,153) In those cases in which he was called by the defense and found that a substance could not be determined to be crack, he was paid $300 an hour by the defense. (Tr.154)

Likewise, although Dr. Evans claimed that he was consulted by the FBI, DEA and the U.S. Department of Transportation, none of this work involved the analysis of a street sample of cocaine base. (Tr.154-55)

Dr. Evans has never used crack himself, he has never manufactured and sold crack on the street, he has never participated in the execution of a search warrant involving the seizure of crack cocaine, he has never arrested a crack dealer, he has been involved in an interview of a crack dealer approximately four times, he has never seen crack made on the street, and he has never participated in a controlled buy of crack. (Tr.156-57)

Dr. Evans has never personally analyzed a street sample of crack. (Tr.159) He has read several scientific journal articles concerning crack, but he could not recall the names of the articles, nor the journals, nor the content of the articles. (Tr.159-62) He has never authored an article on the analysis of a street sample of cocaine base. (Tr.162)

Finally, Dr. Evans was incapable of drawing a simple diagram of the chemical structure of cocaine hydrochloride or cocaine base without consulting a textbook. (Tr.164)[5]

Dr. Evans defined crack cocaine as cocaine base made with a bicarbonate. He based this definition on a pamphlet published by the National Institute of Drug Abuse found on the Internet. (Tr.168-69,177) Further, Dr. Evans testified that even if cocaine base was made with sodium bicarbonate, unless there was a detectable amount of bicarbonate present, the substance could not be called crack. (Tr.171,182-85) On cross-examination, Dr. Evans conceded that the National Institute of Drug Abuse pamphlet he relied upon was not a peer-reviewed scientific journal and, in fact, was printed off the Internet. (Tr.181)

Dr. Evans further testified that crack cocaine does not have a distinct smell,  nor could he tell if a substance containing cocaine base was crack by its appearance or texture. (Tr.175-78)

---

[5] In rebuttal, John Casle drew the chemical structures of both cocaine hydrochloride and cocaine base. In his laboratory, a "rookie chemist" would be capable of diagraming these structures. (Tr.189-90)

Dr. Evans was shown the forensic laboratory report of the seized cocaine base, government exhibit 2, which only indicated the substance contained cocaine base. (Tr.176) When Dr. Evans was then shown government exhibits ,1A, 1B and 1C, unsurprisingly, Dr. Evans stated that he could not identify the exhibits as crack from their appearance, color or texture. (Tr.177-78) He further stated that the exhibits only smelled like plastic. (Tr.178,185)

Conclusion

Detective Ed Root, Troy Fuller and John Casale all qualified as experts on crack using the applicable Seventh Circuit criteria. *Anderson*, 450 F.3d at 301. All three of these witnesses were familiar with the street manufacture and sale of crack cocaine. All of these witnesses have seen street crack hundreds or thousands of times. Once they were told government exhibits 1A,1B and 1C contained cocaine base, all three witnesses were able to positively identify the exhibits as crack, based upon the exhibits' appearance, texture, and smell.

In contrast, Dr. Evans, a toxicologist with virtually no experience with street crack, opined that crack cocaine could not be identified from appearance, texture or smell. Moreover, Dr. Evans claimed that cocaine base could not be identified as crack unless bicarbonate was detected in the substance. In other words, Dr. Evans attempted to *redefine* crack based upon a definition from an article found on the Internet. His definition of crack, in fact, is directly contrary to the holding in *Abdul*, 122 F.3d at 479 ("We hold that while crack might generally be produced using sodium bicarbonate,

-23-

2:05-cr-20043-MPM-DGB    # 51    Page 24 of 25

production with sodium bicarbonate is not the exclusive preparation method recognized for purposes of § 2D1.1(c)." )

Indeed, Dr. Evans' does not qualify as an expert on crack because his testimony was not relevant; it does not "assist the trier of fact to understand the evidence or to determine a fact in issue"because his testimony was not based upon the applicable Seventh Circuit definition of crack. Therefore, his testimony failed to comply with the second requirement of admissibility under *Daubert. See Chapman v. Maytag*, 297 F.3d 682, 687 (7th Cir. 2002)(the offered scientific testimony must be relevant to the issue as defined by the law).

Based upon the testimony of and evidence offered by the United States, as well as the stipulations of the parties, the Court should find the defendant guilty of all charges beyond a reasonable doubt. The Court should further find, beyond a reasonable doubt, that the cocaine base possessed by the defendant was "crack" under 21 U.S.C. §841.

Respectfully submitted,

RODGER A. HEATON
UNITED STATES ATTORNEY

BY:    s/ Colin S. Bruce
       COLIN S. BRUCE, Bar No. IL 6200946
       Assistant United States Attorney
       United States Attorney
       201 S. Vine St., Suite 226
       Urbana, IL 61802
       217/373-5875
       FAX: 217/ 373-5891
       colin.bruce@usdoj.gov

-24-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 30, 2006, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

> Mr. David Thomas
> Attorney at Law
> 53 West Jackson Blvd.
> Suite 1362
> Chicago, IL 60604

> s/ COLIN S. BRUCE
> COLIN S. BRUCE, Bar No. IL 6200946
> Assistant United States Attorney
> United States Attorney
> 201 S. Vine St., Suite 226
> Urbana, IL 61802
> 217/373-5875
> FAX: 217-373-5891
> colin.bruce@usdoj.gov