E-FILED
Monday, 12 November, 2007   08:41:48 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | No. 05CR 20043 |
| | ) | Chief Judge |
| | ) | Michael McCuskey |
| LANCE A. OLIVER | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

DEEFENDANT'S SENTECING MEMORANDUM

Introduction

   18.U.S.C. section 3553(e) provides that "(u)pon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense."

   Significantly, once the government makes a motion under section 3553(e), the length of the departure from the mandatory minimum is entirely within the district court's discretion. See, United States v Wallace, 114 F.3d 652,655 (7th Cir.1997); United States v. Stockheimer, 157 F.3d 1082, 1091(7th Cir.1998).

   Finally, section 3553 (e) states that the reduced "sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission." Of course, after Booker the guidelines are treated as advisory, rather than mandatory. United States v. Booker, 543 U.S. 220,261-63(2005).

   However, "(a)lthough the guidelines are treated as advisory after Booker, the application of section 3553 (a) is mandatory." United States v. Miranda, No. 06-4195, Slip Opinion at 11. (emphasis added). (7th Cir., October 26, 2007). The overarching command of section 3553 (a) is that the "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" therein. (emphasis added). The district court judge " does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," but must instead subject the defendant's sentence to the thorough adversarial testing contemplated by federal

sentencing procedure. Rita v. United States, 127 S.CT.2456,2465 (2007). "As a matter of process, the Supreme Court stated in *Rita,* the district judge will normally begin by considering the PSR and its interpretation of the guidelines, and then hear arguments by the prosecution and defense that a guidelines sentence should not apply, perhaps because the case falls outside the heartland of the guidelines, or because a guidelines sentence fails to reflect the section 3553(a) factors, 'or perhaps because the case warrants a different sentence regardless.' Miranda, supra, Slip Op. at 11. (emphasis added). Thus, after Booker, district courts are free to disagree with the guidelines on general policy grounds, individualized fact-based grounds, or both.

I.  On Count One , Because Even The Sentencing Commission Has Concluded That The Crack Cocaine Guidelines Grossly Overstate The Seriousness Of The Offense, Promote Sentencing And Racial Disparity, And Are Based Upon Erroneous Assumptions Which Promote Disrespect For The Law, Mr. Oliver Should Be Sentenced Based Upon The Guidelines For Powder Cocaine.

Congress created the 100:1 crack powder ratio in the Anti-Drug Abuse Act of 1986. The ratio was based on the perception that "because crack is so potent, drug dealers need to carry much smaller quantities of crack than of cocaine powder" to provide drug users with the same doses. 132 Cong. Rec. S8091 (daily ed. June 20, 1986) (statement of Sen. D'Amato). In addition, crack cocaine, more than any other drug, was considered to be correlated with other serious crimes. *See* United States Sentencing Comm'n, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* 118-19 (1995), *available at* http://www.ussc.gov/crack/exec.htm [hereinafter "U.S.S.C., *1995 Special Report*"] (observing that "the correlation between crack cocaine use and the commission of other serious crimes was considered greater than that with other drugs").

Historically, *low*-level crack cocaine *users* have received sentences similar to (and often higher than) *high*-level powder cocaine *importers*—the very suppliers who provide the powder cocaine that ultimately produces crack cocaine. *See*United States Sentencing Comm'n, *Report to the Congress: Cocaine and Federal Sentencing Policy* 63 (2002), *available at* http://www.ussc.gov/r_congress/02crack/2002crackrpt.htm hereinafter "U.S.S.C., *2002 Report*"] (average sentence of lowest-level crack cocaine offenders was 104 months); *id.* At 43, 45 (average sentence of highest-level powder cocaine traffickers was 101 months). Viewed on a gram-by-gram basis, street level crack dealers are punished 300 times more severely than high-level cocaine powder importers. Eric E. Sterling, *Getting Justice Off Its Junk Food Diet*, White Paper (July 17, 2006), at 4, *available at http:// www t.*cjpf.org/Getting_Justice_Off_Its_Junk_Food_Diet.pdf. Crack defendants also have the longest average period of incarceration of *any* drug offender—approximately 120 months. United States Sentencing Comm'n, *Sourcebook of Federal Sentencing Statistics* (2006), Fig. L, *available at* http: //www.ussc.gov/ANNRPT/2006/SBTOC06.htm [hereinafter "U.S.S.C., *Sourcebook*"].

In a Special Report to Congress in 1995, the Commission used the facts of an actual federal case to illustrate the impact of the 100:1 ratio in practice. In its illustration, two crack defendants purchased 255 grams of powder cocaine from their higher-level supplier and cooked it, yielding 88 grams of crack cocaine they intended to distribute. The higher-level powder supplier was subject to a Guidelines range of 33 to 41 months for selling 255 grams of power, whereas the

2

crack defendants were each subject to a range of 121 to 151 months for buying a portion of the supplier's powder and cooking it. In addition, the crack defendants faced ten-year mandatory minimums, while the supplier was not subject to any mandatory minimum. *See* U.S.S.C., *1995 Special Report*, *supra*, at 174.

Two decades of experience have shown that the 100:1 ratio has resulted in a disproportionate number of low-level offenders being prosecuted for crack offenses. In 2000, barely one in five crack cocaine defendants met the criteria of a "major" or "serious" trafficker. *See* U.S.S.C., *2002 Report*, *supra*, at 39 (noting that, in 2000, approximately 73% of convicted crack cocaine offenders were "street-level" dealers, users, and the like, while only about 21% of defendants were mid-level offenders, such as importers, suppliers, or managers, and less than 6% were the highest-level offenders). This state of affairs is the very antithesis of what Congress had in mind in establishing the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986).

In fact, <u>none of the original justifications for the 100:1 ratio have survived two decades' worth of careful scrutiny</u>. "More recent data indicate that significantly less trafficking related violence or systemic violence . . . is associated with crack cocaine trafficking offenses than previously assumed." U.S.S.C., *2002 Report*, *supra*, at 100. This continues to be the case: in fact, "the prevalence of violence decreased [between 2000 and 2005] . . . continuing a trend identified in the 2002 Commission Report, [and] continues to occur in only a minority of offenses." U.S.S.C., *2007 Report*, *supra*, at 36; *id.* at 37 (percentage of crack offenses categorized as "violent" only 10.4%); *id.* at 33 (in 2005, only 2.9% of crack cocaine offenders used a weapon); *see also* United States Sentencing Comm'n, Transcript of Public Hearing on Cocaine Sentencing Policy 226-27 (Nov. 14, 2006), *available at* http://www.ussc.gov/hearings/11_15_06/testimony.pdf [hereinafter "U.S.S.C., 2006 Public Hearing Tr."] (Test. of Profs. Jonathan Caulkins & Peter Reuter) (crack cocaine violence has declined over time because the average age of crack users has increased). [1] And that is to say nothing of the problem already identified, namely that the 100:1 ratio can result in lengthier sentences for low-level crack users than for the very high-level powder cocaine dealers who supply the drugs needed to convert powder cocaine into crack cocaine.

---

[1] In any event, district courts will, of course, impose higher penalties in cases involving violence, regardless of the type of drug at issue in the underlying offense. *See, e.g.*, U.S. Sentencing Guidelines §§ 2D1.1(b)(1), 2K2.1(b)(6) (weapons enhancements).

3

Nor can the 100:1 ratio be sustained based on the other oft-cited justification: the false perception that there are tangible differences between the two substances. *See, e.g.*, 132 Cong. Rec. 26447 (1986) (statement of Sen. Chiles) (stating that disparate "treatment is absolutely essential because of the especially lethal characteristics of this [crack] form of cocaine"). The Director of the National Institute on Drug Abuse, a division of the U.S. Department of Health & Human Services, recently debunked that myth by testifying that "the pharmacological effects of cocaine are the same, regardless of whether it is in the form of cocaine hydrochloride [powder] or crack cocaine, the base." U.S.S.C., 2006 Public Hearing Tr., *supra*, at 166 (Test. of Dr. Nora D. Volkow, Director, Nat'l Inst. On Drug Abuse, Nat'l Institutes of Health, U.S. Dept. of Health & Human Servs.)[2]

Because of this failure to achieve its original goals, the Commission has urged Congress to eliminate the 100:1 ratio pursuant to its statutory duty to monitor the operation of the Guidelines and federal sentencing system, and to propose amendments to Congress for appropriate modifications, *see* 28 U.S.C. § 994.

In 1995, the Commission released a report concluding that congressional objectives with regard to punishing crack cocaine trafficking can be achieved more effectively without relying on a federal sentencing scheme that includes the 100:1 quantity ratio. *See* U.S.S.C., *1995 Special Report*, *supra*, at 198-200. In reaching this conclusion, the Commission noted that the ratio punishes low-level crack offenders more harshly than wholesale powder distributors. *See id.* at 150-51. The Commission also cited the disproportionate impact of the policy on African-American defendants. *See id.* at 192.

---

[2] The Sentencing Commission has likewise noted that the differential treatment cannot be justified based upon this alleged difference. *See* U.S.S.C., *Fifteen Years*, *supra*, at 132. The Commission noted in particular that: [T]he harms associated with crack cocaine do not justify its substantially harsher treatment compared to powder cocaine. . . . Powder cocaine that is smoked is equally addictive as crack cocaine, and powder cocaine that is injected is more harmful and more addictive than crack cocaine . . . . Recent research has demonstrated that some of the worst harms thought to be associated with crack cocaine use, such as disabilities associated with pre-natal cocaine exposure, are not as severe as initially feared and no more serious from crack cocaine exposure than from powder cocaine exposure.

    In 1997, the Commission returned to Congress with a report once again recommending a modification to the 100:1 ratio. *See* United States Sentencing Comm'n, *Special Reportto the Congress: Cocaine and Federal Sentencing Policy* 2 (1997), *available at* http://www.ussc.gov/r_congress/ NEWCRACK.PDF; *see also id.* at 9 ("[A]s the Commission reported in 1995, we again unanimously conclude that congressional objectives can be achieved more effectively without relying on the current federal sentencing scheme for cocaine offenses that includes the 100-to-1 quantity ratio."). This time, the Commission focused on the incongruity of crack cocaine sentences when measured against the harm to society from the use and sale of the drug. *See id.* at 9. Specifically, the Commission stated that, in its view, "federal sentencing policy should reflect federal priorities by targeting the most serious offenders in order to curb . . . drug trafficking and violent crime," and noted that "current federal cocaine policy inappropriately targets limited federal resources by placing the quantity triggers for the five-year minimum penalty for crack cocaine too low." *Id.* at 7. 3

_____

  3The Commission has revised the crack Guideline ranges, effective November 1,2007.  While the new Guidelines are somewhat less harsh, such that § 3553(a) factors may indicate that a within-Guidelines sentence is warranted in a somewhat higher percentage of cases than formerly, the new Guidelines are unlikely to have a significant impact, in large part because they are still tied to quantity and type (which remain, even with the modifications an inapt approximation of seriousness in crack cases) and do not embody other relevant statutory factors.

Even more recently, the Commission has reiterated its position, having specifically singled out the crack-powder disparity as a category having an "adverse [racial] impact," U.S.S.C., *Fifteen Years*, *supra*, at 131. Accordingly, the Commission concluded, "[r]evising the crack cocaine thresholds would . . . dramatically improve the fairness of the federal sentencing system." *Id.* at 132. The Commission's concern stems from its central mission, as articulated by the relevant enabling statutes. Section 991(b)(1)(B) of Title 28, for example, mandates that the Commission "provide certainty and fairness in meeting the purposes of sentencing, avoid[] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices."4

Just as the Commission has made a "wholesale" judgment excoriating the crack-powder disparity, so too have district courts been making similar judgments in practice at the "retail" level. *Cf. Rita*, 127 S. Ct. at 2488 ("The upshot is that the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale."). Just as did the district court below, other federal courts have concluded that the Guidelines range may often be inappropriate in crack cocaine cases.

In *United States v. Fisher*, for example, the district court determined that the Guidelines range applicable to a crack cocaine defendant "substantially overstat[ed] the seriousness of the offense" following an analysis that discussed past criticisms of the 100:1 ratio. 451 F. Supp. 2d 553, 560-65(S.D.N.Y. 2005). As another district court summed up, "[t]he growing sentiment in the district courts is clear" that the 100:1 ratio "cannot withstand . . . scrutiny" under § 3553(a). *United States v. Perry*, 389 F. Supp. 2d 278, 307 (D.R.I. 2005).5

---

4 Although Congress has acknowledged the criticism of the 100:1 powder-to-crack ratio in asking the Commission to make recommendations regarding whether it should eliminate or reduce the disparity, it has failed to act on the Commission's repeated recommendations. *See, e.g.*, Pub. L. No. 104-38, § 1, 109 Stat. 334, 334 (1995) (rejecting Commission's recommendations); *see also United States v. Pho*, 433 F.3d 53, 56 (1st Cir. 2006) (reporting congress congressional inaction in face of Commission's recommendations since 1995).

5 In fact, a substantial number of district courts have issued opinions with similarly explicit discussions since *Booker*. *See, e.g.*, *United States v.Clay*, No. 2:03CR73, 2005 WL 1076243 (E.D. Tenn. May 6, 2005); *United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005).

Likewise, several appellate judges have made the point that, following *Booker*'s mandate that judges consider all of the factors listed under § 3553(a), "a sentencing court is not only *permitted* but is *required* to evaluate the propriety of applying the 100:1 crack-cocaine ratio in a particular case." *United States v. Williams*, 472 F.3d 835, 848 (11th Cir. 2006) (Barkett, J., dissenting from denial of rehearing *en banc*) (emphases in original). As another judge specifically noted, the Commission's findings with respect to the effects of the 100:1 ratio "can help sentencing courts analyze the § 3553(a) factors . . . . The Commission's findings, in other words, can be considered insofar as they are *refracted through* an individual defendant's case." *United States v. Eura*, 440 F.3d 625, 637 (4th Cir. 2006) (Michael, J., concurring) (emphasis in original); *see also United States v. Gunter*, 462 F.3d 237, 249 (3d Cir. 2006) ("district courts may consider the crack/powder cocaine differential in the Guidelines as a factor, but not a mandate, in the post-Booker sentencing process").

Mr. Oliver is aware of United States v. Miller, 450 F.3d270, 274 (7th Cir.2006), in which the Seventh Circuit rejected the 100:1 ratio as a basis to sentence below the advisory guide-line range pursuant to section 3553(a)(6), which tells courts to take account of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 450 F.3d at 275-76. However, Mr. Oliver's primary argument is not based upon (a) (6), but rather (a) (1) because the higher offense level resulting from the crack guidelines overstates the seriousness of the offense, which may be considered as part of the "nature and circumstances of the offense."

Moreover, for the reasons set forth above, Mr. Oliver believes that Miller has been abrogated by the Supreme Court's decision in Rita. This precise issue is presently pending before the Supreme Court in United States v. Kimbrough, 174 Fed. Appx. 798 (4th Cir. 2006), cert. granted, 2007 WL 2349921(U.S.Aug.20, 2000).

   II. On Count Two Mr. Oliver Should Receive A Sentence Concurrent To That Imposed On Count One Because Of His Disadvantaged Upbringing, Because He Must Receive A Consecutive Sentence Of Five Years On Count Three, And Because Imposing Separate Sentences For Each Of The guns Would Overstate The Seriousness Of The Offense.

One of the 3553 (a) (1) factors is "the history and characteristics of the defendant." It is apparent from even a cursory reading of the PIR that the odds were stacked against Lance Oliver from the very beginning. He was born into poverty and crime on the West Side of Chicago. He never met his father. His mother died when he was 8. In high school he ranked 608th in a class of 617, and he dropped out. He was drinking alcohol, smoking marijuana, and committing crimes as a child. He had no opportunity for a decent life or a good job. None of this justifies selling cocaine but it should mitigate the punishment, which is going to be severe in any event.

When the police executed the warrant, they found two guns "between the mattress and box springs of the bed in the bedroom." (PIR at 4, para.8) It would overstate the seriousness of the offense, and simply be unfair, to punish him by sentencing him separately for each gun under these circumstances. Since he must receive a consecutive sentence of 5 years on Count Three, his sentence on Count Two should run concurrent with that on Count One.

## CONCLUSION

     Mr. Oliver's base offense level for 68 grams of cocaine is 16. Section 2D1.1.  Pursuant to Section 3E1.1, he is entitles to a reduction of two levels for acceptance of responsibility because he went to trial to assert and preserve an issue that did not relate to his factual guilt; <u>ie</u>., whether the cocaine he possessed was crack.  Thus, his adjusted offense level is 14 which, combined with his criminal history category of IV, yields an advisory range of 27 to 33 months.  Adding the mandatory 60 months for Count Three yields a range of 87-93 months.  For the reasons set forth above, in the case at bar a sentence within that range is sufficient, but not greater than necessary, to accomplish the sentencing objectives contained in section 3553 (a).

                                                                Respectfully submitted,

                                                                 _____
                                                                 Attorney for Lance Oliver

David C. Thomas
651 W. Washington
Suite 205
Chicago, Il. 60661
(312)917-8888
dthomas@kentlaw.edu